IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re | ) | Chapter 7 |
| EDWARD A. TUCKER and DEOLINDA V. TUCKER, | ) ) ) | |
| | ) | NO. 2-02-06324-PHX-RJH |
| Debtors. | ) ) | |
| ROBERT J. DAVIS, Trustee, | ) ) | |
| Plaintiff, | ) ) | ADVERSARY NO. 03-00709 |
| v. | ) ) | |
| PAR WHOLESALE AUTO, INC., | ) ) | |
| Defendant. | ) ) | |
| DAVCO ENTERPRISES dba DAVCO MOTORS & DAVCO LEASING; and C.T. COOK, | ) ) ) ) | |
| Plaintiffs, | ) ) | ADVERSARY NO. 04-1179 |
| v. | ) ) | |
| PAR WHOLESALE AUTO, INC., a Texas corporation; and JOHN and JANE DOES I through X; and BLACK & WHITE CORPORATIONS I through IV, | ) ) ) ) ) | OPINION RE PAR'S RECLAMATION RIGHTS |
| Defendants. | ) ) | |

This case presents the issue of whether a reclaiming seller has priority over an unperfected secured creditor. The Court concludes that it does, because an unperfected secured creditor does not qualify as an "other good faith purchaser."

**Procedural Background**

This matter is before the Court on cross-motions for summary judgment filed by Par Wholesale Auto, Inc. ("Par") and DAVCO Enterprises dba DAVCO Motors & DAVCO Leasing, and C.T. Cook (collectively "DAVCO"). The issue is the ownership of three vehicles sold by Par to Harvest Car Company, which was a dba of the Debtor Edward Tucker (hereafter referred to as "Tucker" or "Harvest"). On June 23, 2005, the Court ruled in favor of Par and against DAVCO as to ownership of the three vehicles, indicating that a subsequent opinion would more fully explain the Court's analysis and rationale. This is that opinion.

**Undisputed Material Facts**

The parties are not in total agreement on all the facts, but there are sufficient undisputed material facts upon which the Court is able to enter summary judgment. These are:

Tucker inspected vehicles at Par's place of business in Texas and purchased the three vehicles from Par in April 2001.[1] Tucker delivered a check for one of the vehicles and promised to pay the balance for all of the vehicles. The vehicles were transported from Texas to Arizona and delivered to Tucker at Harvest Car Company.

---

[1] The Court notes that there was some initial confusion as to which three vehicles were sold by Par to Harvest Car Company. Although Par delivered titles for a 1995 GMC Suburban, 1997 Chevrolet Suburban, and 1997 Ford Expedition, the vehicles actually purchased and delivered to Harvest Car Company included a 1995 GMC Suburban, 1997 Ford Expedition, and a 1996 Jeep Cherokee. DAVCO produced inspection reports for the 1995 GMC Suburban, 1997 Chevrolet Suburban, and 1997 Ford Expedition. The inspection report for the 1995 GMC Suburban was dated April 24, 2001. The inspection reports for the 1997 Chevrolet Suburban and 1997 Ford Expedition are dated June 22, 2001, indicating that both vehicles were in Arizona on that date. The Court finds that the June 22, 2001 inspection reports lack any credibility because they contradict other documents submitted by DAVCO, are in direct contradiction to Texas titles and the vehicle transportation records provided by Par, and the company alleged to have performed the June 22, 2001 inspections was later disciplined and its authorization to inspect vehicles and issue titles was revoked by the Arizona Motor Vehicle Division for failing to properly conduct emission inspections and on at least one occasion completing a transaction without having proper ownership documents in hand. Further, the Arizona titles issued to DAVCO for the 1997 Suburban and 1997 Expedition, each of which required an out-of-state vehicle inspection, were dated June 21, 2001, while the inspection report upon which these Arizona titles are allegedly based, were dated June 22, 2001. The Court finds and concludes that no fact-finder could reasonably credit such inspection reports as reliable evidence that the three vehicles were in Arizona on June 22, especially given the evidence that one of the vehicles allegedly inspected on that day, the 1997 Ford Expedition, had never been shipped by Par.

Tucker and DAVCO had a financing agreement[2] whereby DAVCO or C.T. Cook provided floor financing to Tucker to allow Tucker to purchase vehicles and hold them for resale. Per the financing agreement and business dealings between DAVCO and Tucker, Tucker would sign the certificates of title and deliver them to DAVCO. DAVCO would then hold these "open" titles until Tucker sold the vehicles. At least for the vehicles at issue here, DAVCO did not immediately record its alleged interest in the vehicles with the Arizona Motor Vehicle Division, or otherwise indicate the transfer with any other vehicle titling agency, including the Texas Department of Transportation. Nor did DAVCO file a U.C.C.-1 financing statement to perfect its security interest pursuant to Article 9 of the Uniform Commercial Code ("U.C.C."). At all times until DAVCO obtained new titles in Arizona, DAVCO held Texas certificates of title that had been endorsed by the previous owners.

When the check tendered by Tucker to Par to pay for at least one of the vehicles failed to clear Tucker's bank, Par timely made demand for replacement funds or for return of all of the vehicles. Unable to make good on the purchase price, Tucker agreed to return the vehicles, and they were returned to Par on May 24, 2001. At the time the vehicles were returned to Par, DAVCO did not hold registered title to the vehicles and DAVCO's interest was not reflected in the records of either the Arizona Motor Vehicle Division or the Texas Department of Transportation.

Par applied for new certificates of title in Texas, and they were issued to Par in May 2001. DAVCO applied for and obtained certificates in Arizona in June 2001.[3] Also in June, 2001 DAVCO terminated the financing agreement with Harvest Car Company and Tucker, and demanded return of the vehicles.

/

/

---

[2] As noted below, DAVCO claims to have purchased the vehicles from Tucker and therefore was the owner at all relevant times. Even without the Court's conclusion that this transaction was not a valid purchase however, DAVCO also admits that it financed Tucker's acquisition of vehicles for sale at its lot.

[3] The Arizona certificates of title issued by the Arizona Motor Vehicle Division are dated June 18, 2001 for the 1995 GMC Suburban, and June 21, 2001 for the 1997 Chevrolet Suburban and 1997 Ford Expedition. DAVCO has not produced an Arizona certificate of title for the 1996 Jeep Cherokee.

1    At no time did DAVCO ever have possession of the vehicles. The vehicles were
2    held on Tucker's car lot until they were returned to Par in May 2001. DAVCO merely held the
3    Texas certificates of title that had been executed by the previous owners, which DAVCO calls
4    "open" titles. DAVCO held these open titles to secure payment for the monies advanced to Tucker
5    and Harvest Car Company. The executed certificates of title show the transfer from Par to Tucker,
6    but regarding the transfers from Tucker to DAVCO, on at least one of the certificates of title, C.T.
7    Cook signed for both Tucker and DAVCO.

**DAVCO's Ownership Claim Fails Due to Lack of Possession**

The first issue is DAVCO's claim to be the owner of the vehicles, rather than merely a secured lender, at the time they were returned to Par. Arizona Revised Statutes (hereinafter "A.R.S.") § 44-1061(A) requires a seller of goods to immediately transfer the goods, followed by the buyer's actual and continued possession, in order for the sale to be valid as against claims of the seller's creditors.[4]

Here, DAVCO is alleging that it is the owner of the three vehicles in question. However, it is undisputed that DAVCO never had physical possession of the vehicles, or that the vehicles never left Tucker's lot until they were returned to Par in Texas. The Court finds that the situation between Tucker and DAVCO, and the nature of the vehicles that DAVCO claims were transferred to it, do not warrant any kind of symbolic or constructive delivery. The subject matter consists of three vehicles that were shipped from Par in Texas to Tucker in Arizona, and then shipped back to Par in Texas. It was practicable for the vehicles to be shipped to DAVCO, and should have been shipped to DAVCO if a true, non-fraudulent transfer

---

[4] **Sale of chattels unaccompanied by change of possession as prima facie evidence of fraud against creditors and subsequent purchasers.**
A. A sale made by a vendor of goods and chattels in his possession or under his control, or an assignment of goods and chattels, unless the sale or assignment is accompanied by an immediate delivery and followed by an actual and continued change of possession of the things sold or assigned, is prima facie evidence of fraud against creditors of the vendor, or creditors of the person making the assignment, or subsequent purchasers in good faith.
B. The term "creditors" includes all persons who are creditors of the vendor or assignor at any time while such goods and chattels are in his possession or under his control.
A.R.S. § 44-1061.

had taken place. The Court finds there was no actual delivery to DAVCO and that even if some kind of symbolic or constructive delivery had been made, that the delivery was not actual and continuous within the meaning of A.R.S. § 44-1061(A).

Although the origins of this statute pre-date Arizona statehood,[5] and in fact go all the way back to the inception of fraudulent conveyance law more than 400 years ago,[6] Arizona Courts have applied this statute only very infrequently.

Of the few Arizona cases applying A.R.S. § 44-1061, *Wightman v. King*, 31 Ariz. 89, 250 P. 772 (1926), offers additional support. There, based on the absence of actual and continued change of possession after an alleged sale of cattle, or change in the brands on the animals, the Court held that the public would have no knowledge of anything indicating that there had been a sale. *Wightman*, 250 P. at 773. In the present case, because the vehicles remained on the used car lot of Tucker, and DAVCO did not file the certificates of title with the Arizona Motor Vehicle Division, the public and creditors of Tucker would have no knowledge that the vehicles had allegedly been transferred to DAVCO. It is without question that Par was a creditor of Tucker as to all three of the vehicles delivered by Par to Tucker. Upon the dishonor of the check from Tucker, Par was owed the full purchase price for all three of the vehicles. Par qualifies as a creditor and the applicable statute therefore renders the alleged sale to DAVCO fraudulent and void as to Par.

/

/

---

[5] The history of A.R.S. § 44-1061 includes Arizona Territorial Civil, Code 1901, §§ 2700, 2701; Arizona Civil Code 1913, §§ 3276, 3277; Arizona Revised Code 1928, § 1523; and Arizona Code 1939, § 58-103. Paragraph 3276 of the Arizona Civil Code, as adopted in 1913, includes almost the identical language of the current provision:
Every sale made by a vendor of goods and chattels in his possession or under his control, and every assignment of goods and chattels unless the same be accompanied by an immediate delivery, and be followed by an actual and continued change of possession of things sold or assigned, shall be prima facie evidence of fraud as against the creditors of the vendor, or the creditors of the person making the assignment, or subsequent purchasers in good faith.
*Wightman v. King*, 31 Ariz. 89, 250 P. 772, 773 (1926) (quoting from Arizona Civil Code, § 3276).

[6] *Murphey v. Crater (In re Crater)*, 286 B.R. 756, 764 n.10 (Bankr. D. Ariz. 2002)(referring to *Twynes Case*, 3 Coke Rep. 80b (1601)).

Case 2:04-ap-01179-RJH   Doc 26   Filed 08/11/05   Entered 08/11/05 15:57:45   Desc
Main Document    Page 5 of 16

The California Court of Appeals' application of a similar provision in *S. Calif. Collection Co. v. Napkie*, 106 Cal. App. 2d 565, 235 P.2d 434 (1951), is also illustrative. In *Napkie*, the claimant purchased a vehicle from Napkie by paying off a bank loan against the vehicle. Napkie handed the keys of the automobile to the claimant, who was also Napkie's employer. The claimant immediately returned the keys to Napkie and allowed Napkie full and continued use of the vehicle. The question before the California Court of Appeals was whether the alleged transfer of the vehicle from Napkie to the claimant was fraudulent and therefore void. The California statute, Cal. Civil Code § 3440 is similar to the Arizona statute in that it requires the immediate delivery of the personal property sold, followed by the actual and continued change of possession of the things transferred. *Napkie*, 235 P.2d at 437. The court stated that the "delivery must be immediate, actual, visible, apparent and not constructive; possession of the transferee must be continued, and so open and unequivocal as to carry with it the usual marks and indications of ownership." *Id.* (citing *Hepner v. Hepner*, 32 Cal. App. 2d 582, 584, 90 P.2d 321, 322 (1939)). "The change in possession must be an open, visible change, manifested by such outward signs as render it evident that the transferor's possession has wholly ceased." *Id.* "No writings pertaining to the transfer, regardless of number or character, can be substituted for actual and continued change of possession." *Id.* The California Court of Appeals also addressed the symbolic exchange of keys. The Court stated that the delivery of the keys from Napkie to the claimant is not significant because the keys were immediately returned to Napkie. "Symbolic delivery is sufficient only where the character and situation of the property delivered is such that actual and physical delivery cannot be had." *Id.* at 438. When the nature of the property and the situation of the parties renders it practicable, such as in the case of the transfer of an automobile, actual delivery is required. *Id.*

Because A.R.S. § 44-1061 invalidates DAVCO's claim of ownership, its interest must be limited to that of a secured creditor. And because it never perfected either by filing a UCC financing statement, nor reflected its lien on the certificates of title before Par executed its reclamation, it must be regarded as an unperfected secured creditor at the time of the events in

question.[7]

## Sellers' Rights of Reclamation vs. Secured Creditors

Pursuant to A.R.S. § 47-2702 (U.C.C. § 2-702), a seller has a right to reclaim goods when the seller discovers that the buyer has received goods on credit while insolvent. The demand for reclamation must occur within ten days of the buyer's receipt of the goods sold.[8] Under Arizona law, there is no requirement that the demand for reclamation must be in writing, so an oral demand will suffice. A seller's reclamation rights are subordinate to the rights of subsequent buyers in the ordinary course, other good faith purchasers, or lien creditors. A.R.S. § 47-2702(C).

In the present case, Par sold one of the vehicles in exchange for a check tendered by Tucker and was therefore a cash seller on that vehicle. A check is a negotiable instrument and the seller who accepts a check for payment is a cash seller because the transaction is

---

[7] Even though the vehicles are subject to the special rules for creating security interests in goods covered by a certificate of title, *see* A.R.S. §§ 47-9102 and 47-9303, an inventory financier normally perfects its secured interest in the vehicle inventory by filing a U.C.C.-1 financing statement pursuant to A.R.S. § 47-9311(D). *See also* Official Comment 4 to U.C.C. 9-311. Arizona law provides that inventory security interests in motor vehicles are to be perfected "in accordance with the filing provisions" of U.C.C. Article 9. A.R.S. § 28-2135(1)

[8] The Bankruptcy Code also recognizes the seller's right of reclamation. 11 U.S.C. § 546(c). The Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA")(2005) has amended that provision, effective for cases filed after October 17, 2005. The amended § 546(c) extends the time for making the reclamation demand to 45 days (or 20 days after the commencement of the bankruptcy case). Prior to this amendment, the provision had been understood as "recogniz[ing], in part, the validity of section 2-702 of the U.C.C." H Rep. No. 595, 95th Cong., 1st Sess. 371-72 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 86-87 (1978). But since the U.C.C. still requires a demand within 10 days, perhaps the amended § 546(c) creates its own reclamation right, rather than merely validating the right that exists under the U.C.C. This impression is supported by the fact that the amendment also strikes the reference to "any statutory or common law" right to reclaim, and instead simply states that the trustee's powers are subject to "the right of a seller" to reclaim. If the amended § 546(c) creates its own reclamation right, then the analysis made here by applying the U.C.C. provisions and definitions may not apply in a bankruptcy case filed after BAPCPA's effective date, and the issue may instead be whether the amended Bankruptcy Code provision – "subject to the prior rights of a holder of a security interest in such goods or the proceeds thereof" – applies equally to an unperfected security interest as to a perfected security interest. On the other hand, it may be a mistake to assume that the amended § 546(c) was intended to provide an entirely new and self-contained body of reclamation law, because it fails to recognize the rights of buyers in the ordinary course, other good faith purchasers and lien creditors, who were always protected under the U.C.C. Perhaps the intent was to incorporate and expand on the U.C.C. reclamation rights, rather than to supplant them entirely, in which case some U.C.C. analysis may continue to be relevant in interpreting and applying the new § 546(c).

considered a cash sale under the U.C.C. [9] The other two vehicles were sold on credit in exchange for two bank drafts, and Par was a credit seller for those two vehicles. But the U.C.C., as adopted by Arizona, abolished the common law distinction between cash and credit sellers, and both now have reclamation rights.[10] The cash buyer who issues a check for payment receives conditional title as against the seller, and the buyer's right to retain or dispose of the goods is conditional upon his making the payment due.[11] The rights of a cash seller are also bound by the insolvency requirement and ten-day limitation period for reclamation.[12]

As previously stated, Tucker issued a check for one of the vehicles, and intended to pay the balance of the purchase price for the remaining vehicles under two bank drafts. When the check was dishonored and returned to Par, Par immediately contacted Tucker to demand replacement funds or return of the vehicles. Tucker was unable to provide replacement funds and offered to return the vehicles to Par. Based on Tucker's inability to pay his debts in the ordinary course of business or pay the debts as they come due, Tucker was insolvent for purposes of the reclamation statute.[13] Par also made the demand for reclamation within ten days of delivery, as required by the statute. Tucker purchased the vehicles on April 21, 2001 and upon notification of dishonor of the check tendered by Tucker, Par made the demand for return of the vehicles on April 28, 2001. Par met all of the requirements under the Arizona statute for the reclamation of the vehicles, and Par re-took possession of the vehicles in May 2001.

Par's reclamation rights are subject only to the rights of a buyer in the ordinary

---

[9] James M. Ackerman, Note, *Seller's Right to Reclaim Goods Under the U.C.C. – The Ten Day Rule Szabo v. Vinton Motors, Inc., 630 F.2d 1 (1st Cir. 1980)*, 1981 ARIZ. ST. L.J. 821, 822-23 (1981).

[10] *First Nat'l Bank of Ariz. v. Carbajal*, 132 Ariz. 263, 645 P.2d 778, 781-82 (1982); ARS §§ 47-2507 (B) and 47-2702.

[11] A.R.S. § 47-2507(B).

[12] *Carbajal,* 645 P.2d at 782 (citing A.R.S. § 44-2355 [later re-numbered as A.R.S. § 2507] and Official Comment 3 to U.C.C. § 2-507; Official Comment 3 codifies the cash seller's right of reclamation).

[13] Arizona's version of the U.C.C. defines insolvent as a person "who either has ceased to pay his debts in the ordinary course of business or who cannot pay his debts as they become due or who is insolvent within the meaning of the federal bankruptcy law." A.R.S. § 47-1201(23).

course, other good faith purchaser, or a lien creditor. A.R.S. § 47-2702(C). DAVCO's security interest in the vehicles will defeat Par's reclamation rights only if it renders DAVCO a buyer in the ordinary course, an other good faith purchaser, or a lien creditor.

A lien creditor is defined as someone who has acquired a lien by attachment, levy, or the like and does not include a consensual secured creditor. A.R.S. § 47-9102(52). DAVCO's consensual security interest does not qualify DAVCO as a lien creditor.

DAVCO is also not a buyer in the ordinary course, for two reasons. First, as noted above, A.R.S. § 44-1061 invalidates DAVCO's position as buyer, whether in the ordinary course or otherwise. Second, A.R.S. § 47-1201(9) also explicitly requires possession in order to qualify as a buyer in the ordinary course: "[o]nly a buyer that takes possession of the goods or has the right to recover the goods from the seller under chapter 2 of this title [A.R.S. § 47-2101, *et seq.*] may be a buyer in the ordinary course of business." The Court finds that DAVCO never took possession of the vehicles and did not have the right to recover the vehicles under chapter 2 of the U.C.C., as adopted in Arizona. The vehicles were never delivered to DAVCO, and they remained in the possession of Tucker from the time of their delivery until they were returned to Par. A.R.S. § 47-2401(2) requires physical delivery of the goods for title to pass to the buyer. Based on all of the foregoing, the Court finds that DAVCO does not meet the standard as a buyer in the ordinary course.

Having found that DAVCO is neither a lien creditor nor a buyer in the ordinary course, the court must also consider whether DAVCO would fall under the "other good faith purchaser" exception to Par's right to reclaim the goods. The Ninth Circuit's seminal 1979 holding in *Talcott* established that a secured creditor has the status of a good faith purchaser under A.R.S. § 47-2403.[14] The U.C.C. definition of "purchaser" is broad enough to include an Article 9 (Secured Transactions) secured party.[15] The issue that *Talcott* did not resolve,

---

[14] *Los Angeles Paper Bag Co. v. James Talcott, Inc.*, 604 F.2d 38, 39 (9th Cir. 1979)(holding that an inventory and accounts receivable financier with a perfected security interest holds the status of a good faith purchaser within the meaning of A.R.S. § 44-2348 [re-numbered as A.R.S. § 47-2403]).

[15] *Stowers v. Mahon (In re Samuels & Co.)*, 526 F.2d 1238, 1242 (5th Cir. 1976).

9
Case 2:04-ap-01179-RJH    Doc 26    Filed 08/11/05    Entered 08/11/05 15:57:45    Desc
Main Document    Page 9 of 16

however, is whether all secured creditors qualify for "other good faith purchaser" status, or only perfected secured creditors. The creditor in *Talcott* was in fact perfected, so the Ninth Circuit had no occasion there to determine whether its conclusion would also apply to unperfected secured creditors.

A long line of cases suggests that perfection is required to qualify for the good faith purchaser priority over reclaiming sellers, but in each case the creditor was in fact perfected so reliance on such status in those cases was, at best, dictum.[16] This Court has found only one reported case[17] that considers the relative rights of an unperfected creditor and a reclaiming seller, *Guy Martin Buick, Inc. v. Colo. Springs Nat'l Bank*, 184 Colo. 166, 519 P.2d 354 (1974)(en banc). The Colorado Supreme Court there held that because a seller's reclamation right was not listed in U.C.C. § 9-301 [now § 9-317] as having priority over an unperfected security interest, the unperfected security interest must have priority over the seller's reclamation right. And although the reclaiming seller argued that it should be regarded as holding a perfected security interest upon retaking possession (and by § 9-301's cross reference to § 9-312 [now § 9-322], the first to perfect has priority), the court rejected this argument by concluding that a reclamation right is not a species of a security interest. *Id.* at 184 Colo. 174-75, 519 P.2d 359.

---

[16] *Los Angeles Paper Bag Co. v. John Talcott, Inc.*, 604 F.2d 38, 39 (9th Cir. 1979)(the interest of unpaid cash seller is subordinate to the interest of a valid perfected security interest); *Dixie Bonded Warehouse and Grain Co. v. Allstate Fin. Corp.*, 755 F. Supp. 1543, 1552 (M.D. Ga. 1991)(a good faith purchaser's perfected security interest will be prior to an aggrieved seller's interest); *Lavonia Mfg. Co.v. Emery Corp.*, 52 B.R. 944, 946 (E.D. Penn. 1985)(perfected secured creditors were good faith purchasers whose rights are superior to the rights of a reclaiming seller); *Galey & Lord, Inc. v. Arley Corp. (In re Arlco, Inc.)*, 239 B.R. 261, 270-71 (Bankr. S.D.N.Y. 1999)(a creditor with a security interest in after-acquired property who acted in good faith and for value is a good faith purchaser to whose claim that of a reclaiming seller is subject) ; *In re Victory Mkts., Inc.*, 212 B.R. 738, 741-42 Bankr. N.D. N.Y. 1997); *Isaly Klondike Co. v. Sunstate Dairy & Food Prods. Co. (In re Sunstate Dairy & Food Prods. Co.)*, 145 B.R. 34, 344-45 (Bankr. M.D. Fla. 1992)(a lienholder with a pre-existing, perfected floating lien on inventory is a good faith purchaser with rights superior to those of a reclaiming seller).

[17] The issue might have been addressed and resolved in *Carbajal* because the competing secured creditor in that case also failed to perfect its security interest. But there the reclaiming seller failed to make the reclamation demand within ten days so the court held that the seller "then had no rights arising out of Article 2 that would allow [it] to assert a superior interest in the van against First National as a good faith purchaser after the ten day period had expired." 645 P.2d at 782.

Case 2:04-ap-01179-RJH    Doc 26    Filed 08/11/05    Entered 08/11/05 15:57:45    Desc
Main Document    Page 10 of 16

*Guy Martin* was decided in 1974, and its analysis is not applicable in the Ninth Circuit after the *Talcott* decision in 1979. *Talcott* makes clear that priority is not determined by whether the reclamation rights are recognized in then-§ 9-301, but rather by whether the secured creditor qualifies as an "other good faith purchaser." Moreover, *Talcott* relied on two other decisions, the Arizona Supreme Court's decision in *GECC*[18] and the Fifth Circuit's decision in *Samuels*.[19] Both of those cases equated the reclamation right to an unperfected security interest. Therefore to the extent that *Talcott* implicitly adopts the reasoning of *GECC* and *Samuels*, the reclaiming seller in *Guy Martin* would have prevailed because he perfected by obtaining possession[20] before the unperfected secured creditor perfected.

To prevail under *Talcott*, *GECC* and *Samuels*, the secured creditor must qualify as a "good faith purchaser." As *Samuels* correctly notes, a secured creditor expressly satisfies the U.C.C.'s definition of purchaser.[21] To qualify as a "good faith" purchaser, the secured creditor must observe "reasonable commercial standards of fair dealing in the trade."[22] This Court concludes that an inventory financer such as DAVCO fails to observe reasonable commercial standards of fair dealing when it fails to file a financing statement so that credit sellers can become aware of the risk to their reclamation rights and protect themselves by perfecting an inventory purchase money security interest, which requires notification to the conflicting inventory financer.[23] An inventory financer who had an opportunity to perfect and failed to do so therefore fails to qualify as an "other good faith purchaser," and therefore is subordinate to the rights of a reclaiming seller.

---

[18] *Gen. Elec. Credit Corp. v. Tidwell Indus., Inc.*, 115 Ariz. 362, 565 P.2d 868 (1977).

[19] *Stowers v. Mahon (In re Samuels & Co.)*, 526 F.2d 1238 (5th Cir. 1976).

[20] U.C.C. § 9-305, now U.C.C. § 9-313, permits perfection by taking possession.

[21] *Samuels,* 526 F.2d at 1242, citing U.C.C. § 1-201(32)("'purchase' is broad and includes . . . taking by . . . voluntary mortgage, pledge, or lien").

[22] *Id.* at 1243, citing U.C.C. §§ 1-201(19) & 2-103(a)(2) [now 2-103(1)(b)].

[23] U.C.C. § 9-324(b).

1 Based on all of the foregoing, the Court finds and concludes that Par had a right
2 to reclaim the three vehicles; Par timely and properly exercised its rights of reclamation; and
3 DAVCO does not possess an interest in the vehicles that is superior to Par's reclamation rights
4 under A.R.S. § 47-2702.

**Priority of Ownership of Vehicles vis-á-vis Certificates of Title**

As an alternative ground for its conclusions, the Court also finds that Par's claim to ownership would prevail over DAVCO's because Par was the first to have its interest reflected on a properly issued certificate of title.

It is undisputed that at all times prior to DAVCO obtaining Arizona certificates of title in June 2001, the vehicle titles were issued by the state of Texas and that the original certificates had been endorsed by the previous owners. Because the alleged transfer of title from Tucker/Harvest to DAVCO occurred in Arizona, the Court will look to Arizona law to determine when the transfer occurred. Under Arizona law, while there is a requirement for a subsequent purchaser to apply for registration or title within a specified period of time, there is no statute that would invalidate the transfer of title, or ownership, if the purchaser fails to timely make such an application.[24] In Arizona, the vehicle must be registered if it is to be driven on the streets or highways. A.R.S. § 28-2153. If, for instance, a vehicle was purchased and was not to be used on the streets or highways, then the vehicle would not need to be registered with the Arizona Motor Vehicle Division, but the seller would need to transfer the title in the vehicle to the subsequent seller. In Arizona, the legislature has created and intended for a comprehensive system to title and register motor vehicles for transfer and tax purposes; and with each

---

[24] *Reinke v. Alliance Towing*, 207 Ariz. 542, 545, 88 P.2d 1154, 1157 (Ct. App. 2004); and see A.R.S. § 28-2058(A)(1)(d). The Court notes that in Texas, there is a specific statute that invalidates the transfer of title of the vehicle if the certificate of title is not transferred to the new owner at the time of the sale. Vernon's Texas Statutes and Codes, Transportation Code, § 501.071. "Every person who seeks to sell, transfer, or encumber any motor vehicle in Texas [must] obtain a certificate of title . . . regardless of whether the owner is a Texas resident or a nonresident." Opinion Texas Attorney General, 1986, No. JM-611. However, case law interpreting the Texas statute has determined that the term "owner" does not include a used car dealer and there is normally not a requirement for the dealer to secure a certificate of title because the dealer generally holds the vehicle on a dealer's assignment with the intention of selling the vehicle, and not with the intention of becoming an owner. See *In re Dota*, 288 B.R. 448 (S.D. Tex. 2003); *First State Bank v. Austin*, 315 S.W. 2d 390 (Civ. App. 1958); *Motor Inv. Co. v. Knox City*, 174 Tex. 530 (1943).

12

subsequent sale of a vehicle, the system of issuing titles and registering vehicles is repeated throughout the life of the vehicle.[25] However, a certificate of title is only *prima facie* evidence of ownership in Arizona that may be rebutted by credible evidence.[26]

Under both Arizona and Texas law, Par obtained a presumption of valid ownership when Texas issued certificates of title in May 2001. The presumption in favor of Par also works against DAVCO's claim because the presumption as of May 2001 is that DAVCO was not the owner of the vehicles at that time. The presumption in favor of Par's ownership is also supported by Par's physical possession of the vehicles before the Texas titles were re-issued. Although DAVCO has attempted to make allegations that at least two vehicles were in Arizona when it obtained the Arizona titles, this evidence, as stated in footnote 1, is not credible and it does not stand to rebut the presumption in favor of Par. Even if the Court were to ignore the fact that the entity who purportedly conducted the inspections subsequently lost its ability to act as a third party inspecting agent for the Arizona Motor Vehicle Division, and that the inspection reports included a vehicle which was not actually transferred to Tucker/Harvest, the fact remains at best the inspection reports indicate that the purported inspections occurred on June 22, 2001, the day *after* DAVCO obtained titles in Arizona. The inspection reports do not directly rebut that Par had possession at the time that the Texas titles were re-issued, and DAVCO has presented no other evidence that it ever had possession of the vehicles. To the contrary, DAVCO admits, perhaps inadvertently, that it did not have physical possession of the vehicles. Included in the exhibits is a document that indicates on June 4, 2001, DAVCO made demand on Tucker for return of the vehicles belonging to DAVCO, which necessarily implies that the vehicles were not in DAVCO's possession. This demand was again sent to the Debtor on June 21, 2001, the same day that DAVCO obtained Arizona certificates of title in its own name. DAVCO has not presented any evidence, other than the dubious inspection reports, that

---

[25] *Wallace Imports, Inc. v. Howe*, 138 Ariz. 217, 673 P.2d 961, 967 (Ariz. App. 1983).

[26] *Id.* at 673 P. 2d 968-69. *See also Tyler Car & Truck Ctr. v. Empire Fire & Marine Ins. Co.*, 2 S.W. 3d 482 (Tex. App. 1999)(Name on certificate of title is not conclusive of ownership; there is an administrative presumption of ownership which vanishes when positive evidence to the contrary is presented).

it took possession of the vehicles, such as an invoice showing that the vehicles were delivered to DAVCO or moved off of the Harvest Car Company lot. The Court finds that DAVCO has failed to overcome the presumption of ownership that Par obtained when the Texas titles were issued in May 2001.

DAVCO argues that Par illegally obtained new certificates of title in Texas when it applied for duplicate titles. It is DAVCO's position that when Par told the Texas Department of Transportation that it was the owner of the vehicles and that the original titles had been lost that Par knew it was not the recorded owner of the vehicles and that the title had not been lost.[27] The Court finds that DAVCO has presented no evidence that Par's actions were illegal, or any legal argument that even if the applications for new titles contained incorrect information that the titles would be invalid. As was discussed above, this Court finds that upon the dishonor of the check from Tucker, Par had a right to seek replacement funds or return of the vehicles, as allowed under Arizona law and the U.C.C. Par notified Tucker of the dishonor of the check and demanded replacement funds; Tucker offered return of the vehicles, and the vehicles were returned to Texas. When the vehicles were returned to Texas without the certificates of title, it was entirely proper for Par to have the titles re-issued so the property could be sold as part of Par's usual wholesale automobile business. The Court finds no legal basis for a finding that the re-issued certificates of title obtained by Par in May 2001 were procured by fraud or were in any way improper.

Based on the foregoing, the Court finds that both Arizona and Texas have established comprehensive systems to title and register motor vehicles for purposes of transfers

---

[27] The Court notes, as stated previously in the undisputed facts, that at all times until DAVCO obtained new titles in Arizona, DAVCO held Texas certificates of title that had been endorsed by the previous owners. The owners on the face of the Texas titles sold the vehicles to Par and so indicated by their signature on the reverse side of the Texas certificate of title; when Par sold the vehicles to Tucker, Par endorsed the reverse side of the title; and when Tucker delivered the titles to DAVCO, as part of their financing arrangement, Tucker signed and delivered the certificates of title to DAVCO. At no point before the vehicles were returned to Par in Texas did either Par or DAVCO hold titles issued by either Arizona or Texas that showed Par or DAVCO as the "recorded" owner of the vehicles; the "recorded" owners of the vehicles, as reflected in the records of the Texas and on the face of the Texas certificates of title, remained the original owners who sold the vehicles to Par.

of ownership and payment of taxes. Based upon these comprehensive systems and the applicable case law, a valid certificate of title creates a rebuttable presumption of ownership of the subject vehicle. In this case, Par properly obtained possession of the vehicles and valid certificates of title were re-issued. Par had a rebuttable presumption of ownership of the vehicles as early as May 2001. DAVCO has failed to rebut that presumption. The Court finds that summary judgment should be entered in favor of Par based on the priority of ownership as shown on the certificates of title.

**Conclusion**

For these reasons, the Court finds and concludes that Par's interest in the three vehicles is superior to DAVCO's and that DAVCO does not have any legal basis to defeat Par's superior interest. Accordingly, the Court finds that Par is entitled to summary judgment as against DAVCO.

Because this litigation has been administratively consolidated with the Trustee's adversary complaint asserting that Par's reclamation constituted a voidable preference, however, this does not resolve this entire case. There is no reason for Rule 54(b) certification, so this opinion is not a final, appealable judgment.

DATED this 11th day of August, 2005.

Randolph J. Haines
United States Bankruptcy Judge

Copy of the foregoing mailed this
11th day of August, 2005, to:

J. Matthew Derstine, Esq.
Laura E. Sixkiller, Esq.
One Arizona Center
400 E Van Buren Street, Suite 800
Phoenix, AZ 85004
Attorneys for Par Wholesale Auto, Inc.
Fax: (602) 256-6800

1 | Dohn M. Rosenthal, Esq.
  | Dohn M. Rosenthal, P.C.
2 | 6380 E Thomas Road, Suite 324
  | Scottsdale, AZ 85251
3 | Attorneys for Davco Enterprises, Charles Thomas Cook
  | Fax: (480) 945-2678
4 |
  | Giuseppe Acocella, Esq.
5 | Law Office of Edwin Lee, PC
  | 21639 North 12th Avenue, Suite 204
6 | Phoenix, AZ 85027-0001
  | Attorneys for Robert J. Davis
7 | Fax: (623) 869-0391

  /s/ Pat Denk
  Judicial Assistant